# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Peter Allan and Todd Fernandes, | Case No. 24-cv-3088 (ECT/DJF) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION** |
| Shireen Gandhi[1], *Commissioner of the Department of Human Resources, in her official capacity*; Jodi Harpstead, *in her individual capacity*; and Nancy Johnston, *Chairman and Executive Officer of MSOP*; Terry Kneisel; Corey Vargeson; Phil Olson; and Robert Gresczyk, *in their individual and official capacities,* | |
| Defendants. | |

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint ("Motion to Dismiss") (ECF No. 23) pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). Plaintiffs are civilly committed to the Minnesota Sex Offender Program ("MSOP") and allege they were assaulted in separate incidents by another civilly committed person ("Complaint") (ECF No. 1). Plaintiffs claim Defendants violated their rights through negligence and deliberate indifference by failing to keep them safe at the MSOP. (*Id.* at 3.) For the reasons

---

[1] Shireen Gandhi became temporary commissioner of the Minnesota Department of Human Resources after Jodi Harpstead resigned on February 3, 2025. Under Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Shireen Gandhi for Jodi Harpstead in the caption as an official-capacity defendant. But the Complaint also identifies Ms. Harpstead as an individual-capacity defendant (*see* ECF No. 1 at 8), and the Court refers to Ms. Harpstead in its discussion below regarding personal involvement and individual liability for the claims asserted, since only Ms. Harpstead was named in the Complaint or conceivably could have had such involvement or liability.

set forth below, the Court recommends Defendants' Motion to Dismiss be granted and this matter be dismissed.[2]

## BACKGROUND

Plaintiff Peter Allan was indeterminately civilly committed to the MSOP as a sexually dangerous person and as a sexual psychopathic personality by the Otter Tail County District Court on July 16, 2009. (ECF No. 1 at 2; *see also In re Civil Commitment of Allan*, No. A09-1607, 2010 WL 608028 (Minn. Ct. App. Feb. 23, 2010) (affirming commitment).) Plaintiff Todd Fernandes was indeterminately civilly committed to MSOP as a sexually dangerous person by the Hennepin County District Court on June 17, 2005. (ECF No. 1 at 2; *see also In re Civil Commitment of Fernandes*, No. A06-506, 2006 WL 2947642 (Minn. Ct. App. Oct. 17, 2006) (affirming commitment).) Both Plaintiffs reside at the MSOP's secure treatment facility in Moose Lake, Minnesota. (ECF No. 1 at 2-3.)

Plaintiffs filed their Complaint on July 31, 2024. (ECF No. 1.) The Complaint alleges that on July 14, 2024, another MSOP client—A.K.—stole food off Mr. Allan's plate during breakfast and "sucker punched" him when he tried to leave the dining hall. (*Id.* at 4.) The Complaint further alleges Mr. Fernandes then came to Mr. Allan's defense by "sock[ing] [A.K.] in the mouth." (*Id.*) It also states that, though MSOP staff intervened in the altercation, they "astonishingly let [A.K.] go back to his cell," even after Defendant Robert Gresczyk heard A.K. say to Mr. Fernandes "I will get you." (*Id.*)

The Complaint alleges that on July 15, 2024, A.K. met with Defendant Phil Olson, who oversees one of the living units at the Moose Lake facility, and told Mr. Olson he was sorry. (*Id.*)

---

[2] The undersigned United States Magistrate Judge considers this matter pursuant to a general referral in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1.

It alleges Mr. Olson believed A.K. even though A.K. was lying. (*Id.*) Plaintiffs assert that after that conversation, Defendant Olson reassured Plaintiffs the threat was over "so Plaintiffs were not worried about A.K. anymore." (*Id.*)

Unfortunately, the conflict between A.K. and the Plaintiffs did not end there. The Complaint alleges that the next day, while Mr. Fernandes was eating breakfast, A.K. hit Mr. Fernandes on the side of the head. (*Id.*) According to the Complaint, Mr. Fernandes fell to the floor and A.K. continued to hit and kick Mr. Fernandes until MSOP security staff arrived. (*Id.*) Plaintiffs assert that as the MSOP security staff restrained A.K., he said, "this is not over," and that other MSOP clients and Mr. Gresczyk heard A.K.'s statement. (*Id.* at 4-5.)

Plaintiffs contend that Mr. Gresczyk later told Mr. Allan the MSOP should not have permitted A.K. to interact with the facility's general population after the July 14, 2024 altercation (*id.* at 5), and that the MSOP did not initially segregate A.K. because of a staffing problem (*id.*). They also allege that Mr. Allan spoke to Mr. Olson about the altercation, and that Mr. Olson expressed anger and apologized for what happened, stating that he should not have allowed A.K. to return to the general population. (*Id.*)

Plaintiffs acknowledge that following the July 16, 2024 altercation, MSOP staff eventually did place A.K. in a high security, segregated living area and did not permit A.K. to attend certain group events. (*Id.*) But they claim the MSOP was "negligent" in allowing A.K. to live in the general population at all. (*Id.* at 6.) The Complaint alleges that despite A.K.'s known history of violent assaults against both clients and staff at the MSOP for which he has "been sent back to prison numerous times" (*id.* at 5), the MSOP still "brings him back and allows him to walk free in the institution" (*id.*). The Complaint further alleges that at the time of the incidents, although the

3

MSOP ordinarily required A.K. to have a security escort to move around the facility, he was not required to have an escort when he went to meals.  (*Id.* at 5-6.)

In addition to challenging the MSOP's handling of the altercation with A.K., Plaintiffs more generally challenge the MSOP's practices with respect to housing detainees.  The Complaint alleges that A.K. "and other dangerous individuals" should not be allowed to walk unescorted in the facility.  (*Id*. at 7.)  Plaintiffs contend that Mr. Gresczyk "admitted dropping the ball by allowing [A.K.] to walk free" (*id.* at 7) and claim Defendant's failure "to provide a safe and secure [environment]," amounts to deliberate indifference and negligence (*id.* at 11-12).  According to the Complaint, almost all MSOP residents initially came from a prison setting.  (*Id.* at 14.) Plaintiffs challenge the MSOP's practice of placing "inmates from ever[y] custody level" together on the ground that it results in a safety risk.  (*Id.* at 12.)  They assert that the MSOP should house more dangerous inmates from high security prisons separately from less dangerous inmates who come from low security prisons, akin to practices at the Minnesota Department of Corrections and the Federal Bureau of Prisons.  (*Id.* at 14-15.)

Plaintiffs contend the MSOP's failure to prevent A.K. from assaulting them was negligent and deliberately indifferent.  They claim they suffered physical and emotional injuries as a result and that the MSOP did not give them proper care or treatment.  (*Id.* at 12.)  Plaintiffs specifically assert that they both have experienced "severe headaches", take "large amounts of pain meds," and believe they sustained concussions.  (*Id.* at 6.)  The Complaint further alleges that Mr. Fernandes has experienced difficulty with concentration and focus, dropped out of certain educational programs at the MSOP, and took on "different roles in treatment."  (*Id.*)  It also alleges that the "stress and anxiety of A.K. coming around every corner is traumatizing."  (*Id.*)

The Complaint names six state employees as Defendants, each in their official and individual capacities. (*Id*. at 8-11.) Plaintiffs contend Defendants violated their rights under the Eighth and Fourteenth Amendments to the United States Constitution and bring their claims pursuant to 42 U.S.C. § 1983. (*Id*. at 1.) Though it is otherwise unclear which specific laws, statutes or regulations Plaintiffs claim Defendants violated, in a section titled "Nature of the Action," the Complaint describes five types of alleged violations. (*Id*. 7-8.) It claims Defendants:

a. failed to follow established professional standards for the licensure or the professional licensing standards

b. unreasonably depart from the applicable standard of care recognized by the medical community as applicable; where Defendants in fact, departed from that standard; and that the Defendant's departure from the standard amounts to Negligent and Deliberate Indifference.

c. fail to exercise professional & ethical disciplines, judgement, have either committed, or have otherwise acted in concert with other Defendants herein to commit acts of Deliberate Indifference and Negligence to purposely wrongfully continued to allow dangerous bullies to continue to assault clients and staff which amounts to Negligence and Deliberate Indifference.

d. fail to act as mandated reporters of maltreatment, abuse; Plaintiffs alleges each Defendant failed to notify their superiors or any professional authorities, or licensing boards of any acts of Negligence and Deliberate Indifference.

e. makes/made representations in recorded statements/charts that are either false; or otherwise conceals/omit or fails to disclose certain facts that render Plaintiff's current environment. Such false representations in keeping plaintiffs safe amounts to Deliberate Indifference and Negligence.

(*Id.* at 7-8.)

Plaintiffs request an injunction requiring the MSOP to move Plaintiffs to a new facility, and to segregate MSOP clients with histories of violence who presently pose a threat. (*Id*. at 15-16.) Plaintiffs also request a declaratory judgment that Defendants' "Negligence and Deliberate Indifferent conduct" violated Plaintiffs' clearly established constitutional rights, and actual, compensatory, and punitive damages. (*Id*. at 16.)

## DISCUSSION

The Court liberally construes the Complaint in light of Plaintiffs' pro se status and finds that it asserts Eighth and Fourteenth Amendment[3] deliberate indifference claims and state law negligence claims related to: (1.) the MSOP's alleged practice of housing clients with different histories of violence together; and (2.) A.K.'s violent history.  (*See, e.g.*, ECF No. 1. at 11 ("Defendants['] failure to provide a safe and secure [environment] … amount[s] to deliberate indifference"); 7 (Defendants' housing practices "unreasonably depart from the applicable standard of care recognized by the medical community"); 13 ("Defendants['] failure to provide a safe and secure environment … amount[s] to negligence") .  The Complaint also includes a variety of other, loosely-defined legal theories, but as discussed below, these allegations do not plausibly assert any actual claim.  (*See, e.g.*, *id.* at 3, 7-8, 12-15, discussing professional judgment, standard of care, mandated reporting, false representations, and negligent infliction of emotional distress.)

Defendants ask the Court to dismiss Plaintiffs' Complaint on the grounds that: (1) the Complaint fails to state a claim on which relief may be granted; (2) Defendants in their individual capacities are entitled to: (i) official immunity from damages for all state-law claims; and (ii) qualified immunity from damages for any Constitutional claim; (3) Plaintiffs' state-law claims and claims for damages against Defendants in their official capacities are barred by Eleventh Amendment sovereign immunity; and (4) Plaintiffs' proposed declaratory relief is unavailable. (ECF No. 26 at 7-33.)   Because the Court recommends dismissal on grounds of sovereign

---

[3] As civilly-committed persons, Plaintiffs are entitled to at least the same protections under the Fourteenth Amendment Due Process Clause as prisoners receive under the Eighth Amendment, and the same legal standard applies.  *See Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) (holding that deliberate indifference claims brought by pretrial detainees are evaluated under the same standard as claims brought by prisoners); *Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) (applying the same standard to claims brought by pretrial detainees and civilly-committed persons); *Nelson v. Shuffman*, 603 F.3d 439, 446, fn.3 (8th Cir. 2010) (same).

immunity and failure to state a claim under Rule 12(b)(6), it does not address Defendants' claims regarding official or qualified immunity or the availability of Plaintiffs' proposed declaratory relief.

## I.    Constitutional Claims

Liberally construing Plaintiffs' Complaint, the Court identifies two potential deliberate indifference claims based on the MSOP's alleged failure to adequately protect them from other prisoners: (1) the MSOP's alleged practice of housing residents with different histories of violence in the same facility is deliberately indifferent to the risk of harm to MSOP residents housed with violent offenders; and (2) MSOP staff were deliberately indifferent to the specific threat of harm to Plaintiffs posed by A.K. (*See* ECF No. 1 at 13.) The Court also construes Plaintiffs' allegations regarding inadequate medical care as a claim for deliberate indifference to their medical needs.

### A.    Deliberate Indifference

The Eighth and Fourteenth Amendments impose a duty on state officials to protect prisoners and civil detainees from violence at the hands of other prisoners or detainees. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Holden*, 663 F.3d at 341 (making *Farmer* applicable to civil detainees under the Fourteenth Amendment). To establish a constitutional claim for a failure to protect, a plaintiff must show that a detention facility official was deliberately indifferent to a substantial risk of serious harm to the plaintiff. *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 923 (8th Cir. 2010). As a threshold issue, a plaintiff must establish he was confined under conditions posing a substantial or pervasive risk of serious harm. *Id.* (citing *Farmer*, 511 U.S. at 828); *see also Vandevender v. Sass*, 970 F.3d 972, 977 (8th Cir. 2020) (explaining that the "pervasive risk" standard mirrors the general standard in *Farmer* but requires showing the risk is more than an isolated incident or incidents). The plaintiff must then show that a facility official was subjectively

deliberately indifferent to that risk, *i.e.*, that the official actually knew of a substantial risk of serious harm and failed to respond reasonably. *Whitson*, 602 F.3d at 923. The subjective inquiry requires that the official was both aware of facts from which an inference could be drawn that a substantial risk of harm existed, and they must draw the inference. *Walls v. Tadman*, 762 F.3d 778, 782 (8th Cir. 2014) (citation omitted). State officials "may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 826.

### 1.    General Housing Practices

Plaintiffs contend the MSOP's practice of housing residents with violent criminal histories in the same facility as residents with less violent criminal histories creates an inherent risk of harm (the "Housing Practices" Claim). (*See* ECF No. 1 at 13, "By combining any and all inmates from every type of security at MSOP and putting them all together, Defendants knew of the dangers just as the prisons did and did nothing to prevent it.") To the extent Plaintiffs seek monetary damages, their Housing Practices Claim is barred by sovereign immunity under the Eleventh Amendment. The Court further concludes Plaintiffs' Housing Practices Claim fails under Federal Rule of Civil Procedure 12(b)(6) and should be dismissed in its entirety on that ground.

### a.    Sovereign Immunity

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the text of the Amendment does not address suits against states brought by their own citizens, the Supreme Court has long held that a nonconsenting state is generally immune to such suits. *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890); *Duhne v. New*

*Jersey*, 251 U.S. 311, 313 (1920); *Emps. of Dep't of Pub. Health and Welfare, Mo. et al. v. Dep't of Pub. Health & Welfare, Mo., et al.*, 411 U.S. 279, 280 (1973); *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). When a suit names a state or one of its agencies or departments as the defendant, immunity applies "regardless of the nature of the relief sought," *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), or whether the claim is based in federal or state law, *see id.* at 117-121.

Congress can abrogate the states' sovereign immunity through federal legislation if it: (1) unequivocally expresses an intent to do so; and (2) does so within the scope of its constitutional powers. *See Tennessee v. Lane*, 541 U.S. 509, 517 (2004). This exception to sovereign immunity does not apply to claims arising under 42 U.S.C. § 1983 ("Section 1983"), however, since the United States Supreme Court has conclusively held that Congress did not intend for Section 1983 to abrogate the states' sovereign immunity. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 67 (1989) ("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent.").

Further, claims against state officials named as defendants in their official capacities are generally regarded as claims against the state itself. *Pennhurst*, 465 U.S. 89 at 101-02. For these reasons, any claims for monetary damages Plaintiffs seek to assert against the Defendants in their official capacities are barred under the Eleventh Amendment. But courts have long recognized an exception to immunity against official-capacity liability. Under the *Ex Parte Young* doctrine, when a plaintiff sues state officials in their official capacities for prospective injunctive relief, the officials lose the defense of sovereign immunity. *See Pennhurst*, 465 U.S. at 104-05. "[The doctrine] rests on the premise … that when a federal court commands a state official to do nothing

9

more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011).

The Complaint in this action includes no specific allegation as to what any individual Defendant did or failed to do with respect to the enactment or enforcement of the alleged policy and practice of housing detainees with violent and non-violent histories together. Therefore, Plaintiffs' Housing Practices Claim can only fairly be read as a claim against the Defendants in their official capacities. And because Plaintiffs' non-specific Housing Practices Claim is actually a claim against the state, sovereign immunity applies to the extent they seek monetary damages. *Gorman v. Bartch*, 152 F.3d 907, 914 (1998) ("Claims against individuals in their official capacities are equivalent to claims against the entity for which they work."). But to the extent they seek a prospective injunction mandating a change to the MSOP's general housing policies or practices, the *Ex Parte Young Doctrine* applies. The Court thus finds Defendants are subject to suit in their official capacities on Plaintiffs' Housing Practices Claim to that limited extent. The viability of that claim under Rule 12(b)(6) is addressed below.

### b.    Failure to State a Claim

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the

complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

A complaint's factual allegations need not be detailed, but they must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing authorities). A complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A court's consideration of whether a pleading states a claim is "context-specific" and the court must "draw on its judicial experience and common sense." *Id.* at 679; *see also, e.g.*, *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (en banc) (quoting *Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014) (cleaned up)). Although pro se complaints must be construed liberally, such complaints still must allege sufficient facts to state a claim as a matter of law. *See, e.g.*, *Sandknop v. Mo. Dep't of Corr.*, 932 F.3d 739, 741 (8th Cir. 2019) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)).

In evaluating Defendants' Motion to Dismiss under Rule 12(b)(6), the Court limits its review to the allegations asserted in the Complaint. Mr. Allan responded to Defendants' Motion to Dismiss with a variety of new allegations.[4] (*See e.g.*, ECF No. 30 at 3-8, new allegations related

---

[4] Mr. Fernandes did not sign Mr. Allan's response to the Motion to Dismiss (*see* ECF No. 30 at 25; ECF No. 30-1 at 2), nor did he submit his own response (*see* Docket). Mr. Allan is not an attorney and may not represent Mr. Fernandes. Minn. Stat. § 481.02 (prohibiting unauthorized practice of law). Mr. Allan's response therefore cannot serve as Mr. Fernandes' response. Courts generally construe a plaintiff's failure to respond to a motion to dismiss as a waiver of any defense and a voluntary dismissal of the plaintiff's claims. *See, e.g.*, *Cox v. Harpstead*, No. 22-cv-478 (PJS/DJF), 2022 WL 16541218, at *2 (D. Minn. Sept. 21, 2022), *report and recommendation adopted*, 2022 WL 16541087 (D. Minn. Oct. 28, 2022) ("Plaintiff's failure to respond to Defendants' Motion to Dismiss constitutes waiver and abandonment of his Complaint"). But Mr. Ferndandes is a pro se litigant and may be unaware of the requirement that he must either submit his own filings or sign any joint filings he intends to submit with Mr. Allan. Given this concern, and in light of the Court's preference for deciding matters on the merits, the Court ordinarily might direct Plaintiffs to refile their response with both Plaintiffs' signatures so Mr. Fernandes' claims can be considered. For the reasons set forth below, however, the Court finds the Complaint should

to Defendants and the MSOP's history; *id.* at 9-11 new allegations related to the MSOP's housing; *id.* at 12-13 new allegations related to Plaintiffs and A.K.)  But "it is axiomatic that a complaint may not be amended by briefs in opposition to a motion to dismiss."  *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (internal quotation marks and citation omitted).  The Court therefore analyzes the Complaint as written, without considering any new allegation.

The Court first considers whether the Complaint properly asserts Plaintiffs' Housing Practices Claim against any Defendant.  While Plaintiffs fail to connect any Defendant to any specific allegation, a particularized showing of a Defendant's specific role in the conduct is not required for official capacity claims based on general conditions of confinement.  All *Ex Parte Young* requires is that the Defendants have a connection with the alleged constitutional violations through their official positions.  *See Ex Parte Young*, 209 U.S. at 157; *281 Care Committee*, 638 F.3d at 632; *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005).  Here, Defendants, in their official capacities, are sufficiently connected to the alleged Housing Practices Claim to meet this standard, either by virtue of their direct roles in management of the facility where Plaintiffs are housed, or because they hold positions that could conceivably give them supervisory authority over policies concerning the placement of MSOP detainees.  *See 281 Care Committee v. Arneson*, 638 F.3d 621, 632-33 (8th Cir. 2011) (finding sufficient connection under the *Ex Parte Young* doctrine when Minnesota attorney general could conceivably enforce an allegedly unconstitutional state law despite never having done so or communicated an intent to do so).  "At the motion-to-dismiss stage, the Court

---

be dismissed under Rule 12(b)(6) in any event, such that directing Plaintiffs to refile their response would be an exercise in futility.  The Court accordingly refrains from directing Plaintiffs to refile their response.

need only determine whether a defendant is a '*potentially* proper party for injunctive relief.'" *Farella v. Anglin*, No. 5:22-cv-5121, 2023 WL 5005384, at *5 (W.D. Ark. Aug. 5, 2023) (quoting *Reprod. Health Servs. of Planned Parenthood*, 428 F.3d at 1145) (emphasis in the original).

Plaintiffs' Housing Practices Claim is nonetheless deficient. The Complaint describes just two incidents to support Plaintiffs' contention that the MSOP's practice of housing residents with violent criminal histories in the same facility as residents with less violent criminal histories creates an inherent risk of harm. (*See* ECF No. 1 at 13, "By combining any and all inmates from every type of security at MSOP and putting them all together, Defendants knew of the dangers just as the prisons did and did nothing to prevent it."; ECF No. 1 at 4-5, describing Plaintiffs' altercations with A.K.) Though Plaintiffs vaguely allege A.K. had a "known history of violent assaults against both clients and staff at the MSOP" (ECF No. 1 at 5), they fail to identify when, how or how often any such alleged assaults occurred. This conclusory allegation does not give rise to a plausible inference that the MSOP's housing practices create a substantial or pervasive risk of serious harm. *Vandevender*, 970 F.3d at 977-78l; *Beaton v. Tennis*, 460 F. App'x 111, 114-15 (3d Cir. 2012) (unpublished) (affirming dismissal of failure to protect claim based on a known type of assault with padlocks that occurred only one or two times per year); *see also Iqbal*, 556 U.S. at 678 (asserted inferences must be plausible); *Hanten*, 183 F.3d at 805 (courts need not accept conclusory allegations as true on a motion to dismiss). Rather, there is a substantial risk of harm in a state facility only if violence occurs with sufficient frequency that detainees reasonably fear for their safety and state officials are reasonably apprised of the problem and the need for protective measures. *Vandevender*, 970 F.3d at 977-78l. And secure facilities "are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence." *Blades v. Schuetzle*, 302 F.3d 801, 803-04 (8th Cir. 2002) (internal quotation marks and citation

omitted).  The Complaint's general claim that violence is pervasive, along with allegations of just two discrete instances of violence, thus does not establish the existence of a substantial risk of harm based on the MSOP's housing practices or policies.

Furthermore, Defendants' professional judgment regarding where the detainees committed to their care should be housed is entitled to the Court's deference.  Plaintiffs cite *Youngberg v. Romeo*, in which the U.S. Supreme Court held that the Fourteenth Amendment requires states to provide reasonable safety for residents in civil commitment facilities, but the *Youngberg* Court also emphasized deference to the professional judgment of facility administrators.  457 U.S. 307, 322-324 (1982).  The Court held that facility decisions, if made by a professional, are presumptively valid unless the decision is "such a substantial departure from accepted professional judgement, practice, or standards" to demonstrate that the decision was not supported by adequate judgment.  *Id.*

Plaintiffs attempt to address this standard by alleging that Defendants' housing placement practices reflect a significant departure from accepted practice.  (*See* ECF No. 1 at 8, alleging that Defendants "fail to exercise professional [and] ethical discipline[] [and] judgment"; 12, 13, alleging "substantial departure from accepted practice, judgment, and/or standards"; 14, alleging that housing MSOP detainees in the same facility regardless of the security level of their former incarceration "is not using professional judgment"; *id.* asserting that the Bureau of Prisons ("BOP") and the Minnesota Department of Corrections ("DOC") segregate prisoners based on level of dangerousness.)  But the Complaint offers only a conclusory statement and pleads no facts to support this claim.  It identifies no scientific, professional or legal authorities establishing the professional standard for housing civil detainees, and points to no facts establishing that the MSOP's housing practices are in any way different from those implemented in analogous civil

detention programs in other states. To the extent Plaintiffs offer the BOP and the DOC as comparators, they fail to acknowledge the differences between criminal detention for punitive purposes and detention at the MSOP—where all residents, by definition, have been found in need of indefinite civil commitment because they present a continuing danger to others. *See* Minn. Stat. § 253D.07 (authorizing civil commitment of individuals with "sexual psychopathic personalit[ies]" and "sexually dangerous person[s]"); Minn. Stat. § 253D.02 subd. 15 (defining a person with a "sexual psychopathic personality" as a person who is "dangerous to other persons"); Minn. Stat. § 253D.02 subd. 16 (defining a "sexually dangerous person" as a person who is "likely to engage in acts of harmful sexual conduct" against others). Plaintiffs' bare conclusory claim that Defendants failed to exercise professional judgment is insufficient to establish that MSOP's alleged practice of housing clients with different criminal histories in the same facility is a departure from accepted professional standards, let alone a substantial departure. (*See* ECF No. 1 at 12-15.) Under *Youngberg*, MSOP's housing placement decisions are thus presumptively valid, and Plaintiffs' Housing Practices Claim should be dismissed for these reasons.

### 2.    Failure to Protect from A.K.

Plaintiffs also claim deliberate indifference based on the specific risk that A.K. allegedly posed. (ECF No. 1 at 13, "Plaintiffs were assaulted in the MSOP institution after officials were well aware of the prior bullying and assaultive behaviors of the assaulter [A.K.]. MSOP officials were aware of the past, present, and future danger and failed to stop it. Defendants knew of the impending dangers from the assaulter and failed to protect Plaintiffs' rights.") Because this matter is before the Court on Defendants' Motion to Dismiss under Rule 12(b)(6), the Court draws all reasonable inference from the facts alleged in Plaintiffs' favor. Accepting Plaintiffs' allegations about A.K.'s violent history, his need for a security escort, the two incidents involving A.K., and

his threat against Mr. Fernandes after the July 14th altercation (*see* ECF No. 1 at 4-5) as true, the Court may infer that it properly alleges A.K. posed a substantial risk of serious harm to both Plaintiffs. Nevertheless, for the reasons discussed below, the Complaint fails to plausibly allege deliberate indifference because it does not show that any Defendant acted unreasonably in response to that risk.

### a.    Assault on Mr. Allan

With respect to A.K.'s assault on Mr. Allan on July 14, the Complaint's general allegations about A.K.'s violent history and need for a security escort do not plead that any particular Defendant was aware of a substantial risk of serious harm A.K. posed to him. *Lindsey v. Kneisel*, No. 22-cv-413 (NEB/DJF), 2023 WL 386730 (D. Minn. Jan. 6, 2023) (dismissing MSOP resident's deliberate indifference claim that was not specific to any individual defendant), *aff'd*, No. 23-1125, 2023 WL 4241805. Because the Complaint does not allege that any specific Defendant knew of anything more than a generalized risk A.K. posed to other detainees based on his criminal history, the Complaint does not plausibly allege that any Defendant acted unreasonably, such that any deliberate indifference claim based on the risk to Mr. Allan fails. *Whitson*, 602 F.3d at 923.

### b.    Supervisor Defendants' Liability

The Complaint further fails to assert sufficiently particularized allegations regarding Defendants Harpstead, Johnston, Kneisel and Vargeson, who appear to be named solely due to their supervisory roles at MSOP ("Supervisor Defendants"). The Complaint alleges that Defendants Harpstead and Johnston "implemented, retained, and carried out" unspecified practices and policies in violation of unidentified "Constitutional, statutory, and common law rights" (ECF No. 1 at 8-9), and that Defendants Kneisel and Vargeson "directly participated in and/or [knew] about, and exercised reasonably close supervision of person[nel] who are responsible for, the

16

deprivation of Plaintiffs['] Constitutional rights as alleged herein" (*id.* at 9-10).  It includes no additional factual allegations about the Supervisor Defendants, nor does it detail in any way how any of the Supervisor Defendants was personally involved in the incidents underlying Plaintiffs' claims.  There is no statement in the Complaint from which the Court might determine what unconstitutional policy Defendants Harpstead or Johnston allegedly implemented or the actions either of them purportedly took in enacting or enforcing that policy.  The Complaint similarly lacks any statement regarding how Defendants Kneisel or Vargeson might have known about their supervisees' allegedly unconstitutional conduct or any actions they took to participate in it.  The Court finds that Plaintiffs' statements are conclusory and thus fail to plausibly allege any claim to relief against these Defendants.  *See Allan v. Hebert*, No. 21-cv-166 (PJS/LIB), 2021 WL 8055443 (D. Minn. Dec. 15, 2021) (recommending dismissal of claims that failed to plausibly allege the personal involvement of defendants), *report and recommendation adopted*, 2022 WL 741040, at *6-*8 (D. Minn. Mar. 11, 2022).

Because Plaintiffs do not properly allege any Supervisor Defendant's personal involvement, they cannot establish any constitutional claim against them.  As a threshold matter, claims against state officials based on their alleged failure to train or supervise subordinates are properly asserted as individual-capacity claims; not official-capacity claims.  *See Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) ("When supervisory liability is imposed, it is imposed against the supervisory official in [her] individual capacity for [her] own culpable action or inaction in the training, supervision or control of [her] subordinates."); *Holmes v. Minnesota DOC, et al.*, 23-cv-2969 (PJS/DJF), 2024 WL 5318972, at *8 n.8 (D. Minn. Dec. 6, 2024), *report and recommendation adopted*, 2025 WL 71607 (D. Minn. Jan. 10, 2025).  Furthermore, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory

of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Rather, in lawsuits arising under 42 U.S.C. §

1983, "a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Id.*; *see also Ouzts v. Cummins*, 825 F.2d 1276,

1277 (8th Cir. 1987) ("a warden's general responsibility for supervising the operations of a prison

is insufficient to establish personal involvement"); *Holmes*, 2024 WL at *13-14 (holding

supervisors should be dismissed because plaintiff failed to plead specific facts showing they knew

any supervision or training was inadequate, and  high-level officials should be dismissed because

plaintiff failed to link them to enactment or enforcement of challenged policy).  The Court thus

recommends that the Supervisor Defendants[5] be dismissed because the Complaint: (1) fails to

allege any facts to plausibly show that they have, through their own actions, violated the

Constitution; and (2) does not state any state constitutional claim against them.  *See Jackson v.

Nixon*, 747 F.3d 537, 545 (8th Cir. 2014) (finding prisoner did not plausibly allege facts showing

direct involvement of warden in enforcing unconstitutional policies when prisoner solely alleged

warden "knew or should have known" of alleged violation); *Reynolds v. Dormire*, 636 F.3d 976,

979-91 (8th Cir. 2011) (finding prisoner did not plausibly allege deliberate indifference claims

against prison staff and warden when prisoner did not plead facts showing involvement of such

defendants in any violation).

### c.    Defendants Olson and Gresczyk

In contrast, the Complaint alleges particularized facts regarding Defendants Gresczyk and

Olson and their knowledge of A.K.'s threat against Mr. Fernandes.  The Complaint asserts that

Defendant Gresczyk heard A.K. tell Mr., Fernandes "I will get you" after the July 14 altercation.

---

[5] Because the Court finds these Defendants should be dismissed in both their individual and official capacities, Defendant Gandhi, whom the Court automatically substituted for Ms. Harpstead in her official capacity (*see supra* n.1), should also be dismissed.

(ECF No. 1 at 4.)  The Complaint also alleges that Mr. Gresczyk "admitted [to] dropping the ball by allowing [A.K.] to walk free" after that altercation.  (*Id.* at 7.)  The Complaint further alleges that Defendant Olson met with A.K. on July 15, that Defendant Olson believed A.K. when A.K. apologized for his actions on July 14 even though A.K. lied, and that Defendant Olson reassured Plaintiffs they were safe.  (*Id.* at 4.)

But though these allegations point to specific knowledge on the part of Defendants Olson and Gresczyk, the Complaint does not plausibly allege that Defendants Olson or Gresczyk "actually [knew] of a substantial risk and fail[ed] to respond reasonably."  *Whitson*, 602 F.3d at 923.  "[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm."  *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996).  Thus, the lone allegation that Defendant Gresczyk overhead A.K. threaten Mr. Fernandes shortly after altercation on July 14 is not enough to establish that Defendant Gresczyk had subjective knowledge A.K. would make good on his threat.  The Complaint therefore fails to allege sufficient facts to show that Defendant Gresczyk was subjectively aware of a *substantial* risk A.K. would harm Mr. Fernandes.  (*Compare* ECF No. 1 at 1-7, alleging Defendant Gresczyk was aware of a single threat, *with Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007), finding a plausible claim for deliberate indifference when prison officials were aware of multiple threats and victim repeatedly expressed concern about them.)  Moreover, any assessment of the risk A.K. may have posed to Mr. Fernandes would have to be weighed against the risk Mr. Fernandes posed to A.K., since Mr. Fernandes admittedly assaulted A.K. during the July 14 altercation.

The Complaint also fails to plausibly allege Mr. Gresczyk acted unreasonably in response to the July 14 incident.  While it alleges Defendant Gresczyk is a security staff member and that he broke up the July 14 altercation after Mr. Fernandes hit A.K., the Complaint does not allege

that Defendant Gresczyk personally failed to reasonably respond to it. (ECF No. 1 at 1-7.) Plaintiffs complain that Mr. Gresczyk "astonishingly let A.K. go back to his cell" (ECF. No. 1 at 4), but they fail to allege what action Mr. Gresczyk should have taken instead and do not explain how sending A.K. back to his cell could have increased the risk to their safety. The Court cannot draw an inference from these allegations that Mr. Gresczyk's response was unreasonable. The Complaint fails to establish Defendant Gresczyk was deliberately indifferent for these reasons. *Whitson*, 602 F.3d at 923.

The Complaint similarly fails to plausibly allege Defendant Olson's response to the July 14 incident was deliberately indifferent. Plaintiffs allege Defendant Olson reassured them they were safe after meeting with A.K. because he believed A.K.'s apology. (ECF No. 1 at 4.) These allegations concede that Defendant Olson believed A.K. no longer posed a substantial risk of serious harm, such that he could not have been subjectively aware of that risk. (*Compare* ECF No. 1 at 4 *with Hodges v. Dep't of Corr.,* 61 F.4th 588, 593 (8th Cir. 2023) (no deliberate indifference when prison officials concluded two inmates were not incompatible, and therefore did not draw the required subjective inference)). And in light of that subjective, albeit incorrect, belief, Mr. Olson's response to the July 14 altercation was entirely reasonable. The Complaint details how Mr. Olson spoke to all participants involved in the altercation and found no ongoing threat. (ECF No. 1 at 4.) Plaintiffs themselves at that time believed the response was adequate. (*See* ECF No. 1 at 4, acknowledging "Plaintiffs were not worried about A.K. anymore" after Mr. Olson reassured them.) Thus, to the extent Mr. Olson knew of any risk, he "responded reasonably to [that] risk, even [though] the harm ultimately was not averted," and was not deliberately indifferent. *Farmer*, 511 U.S. at 826.

Finally, Plaintiffs do not appear to contend that Defendants' handling of the assault on Mr.

Fernandes on July 16, 2024 was unreasonable.  According to the Complaint, MSOP officials responded to that incident by handcuffing A.K. and moving him to a high security area of the facility where he would have no contact with the general population.  (ECF No. 1 at 4-5.)  Because the Complaint does not plausibly allege that any Defendant was deliberately indifferent to any risk of harm to either Mr. Allan or Mr. Fernandes, the Court recommends that their deliberate indifference claim be dismissed.

### B.  Deliberate Indifference to Plaintiffs' Medical Needs

The Complaint also alleges that Defendants' housing practices "unreasonably depart from the applicable standard of care recognized by the medical community as applicable" and that the departure "amounts to Negligent and Deliberate Indifference".  (ECF No. 1 at 7.)  The legal theory supporting this claim is unclear, but it might be construed as an attempt to establish deliberate indifference to a medical need.

The Eighth Amendment proscribes "cruel and unusual punishments."  U.S. Const. amend. VIII.  Accordingly, "[c]onditions [of confinement] must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  "But the Constitution does not mandate comfortable prisons."  *Id.* at 349.  Only conditions that "deprive inmates of the minimal civilized measure of life's necessities" may violate the Eighth Amendment's proscription.  *Id.* at 347.  "Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations and citations omitted).  To successfully plead a claim of deliberate indifference to a medical need, a plaintiff must demonstrate: (1) that he suffered from an objectively serious medical need; and (2) that the defendant knew of the need and yet

deliberately disregarded it. *See Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). The second prong of this analysis requires the Court to consider "the official's knowledge at the time in question," not what the official knew after the violation occurred. *Id.* at 915. This subjective requirement is "'akin to that of criminal recklessness,' requiring more than negligence." *De Rossitte v. Correct Care Solutions, LLC*, 22 F.4th 796, 802 (8th Cir. 2022) (quoting *Blaire v. Bowersox*, 929 F.3d 981, 987-88 (8th Cir. 2019)).

Here, the Complaint fails to state a claim for deliberate indifference to a medical need because it does not allege that: (1) either Plaintiff was denied necessary medical care; (2) either Plaintiff had a serious medical need; or (3) any Defendant specifically knew of and disregarded a medical need. *See Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006) ("Deliberate indifference requires a showing that the medical provider knew of and disregarded a serious medical need"). The Complaint thus does not come close to plausibly asserting a claim of deliberate indifference to a medical need and, to the extent Plaintiffs attempt to assert such a claim, that attempt should be rejected.

## II.    State Law Claims

### A.    Sovereign Immunity

Plaintiffs also assert a variety of claims against Defendants that arise under state law. As a threshold matter, to the extent Plaintiffs seek to hold Defendants accountable for negligence or any other state law claim in their official capacities, their claim is barred by the Eleventh Amendment because the State of Minnesota has not waived its immunity from suit in federal court. *See Hans*, 134 U.S. at 15 (a nonconsenting state is generally immune to suits, even those brought by its own citizens); *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir.2000) (federal courts lack jurisdiction over state law claims against nonconsenting state or state officials); *see*

*also* Minn. Stat. § 3.736, subd. 2 (tort claims asserted against the state must be brought in "the courts of the state"). Plaintiffs' state law claims against Defendants in their official capacities thus fail. And for the reasons discussed below, all of Plaintiffs' state law claims against Defendants in their personal capacities fail because they fail to state a claim upon which relief can be granted.

### B.    Failure to State a Claim

#### 1.    Negligence

Plaintiffs claim Defendants' collective failure "to provide a safe and secure [environment]" amounts to negligence. (ECF No. 1 at 13-14.) Under Minnesota law, a claim for negligence must establish that: (1) a defendant had a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach proximately caused an injury; and (4) an injury exists. *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007). A duty to protect another person from harm exists when: (1) there is a special relationship between the parties; and (2) the risk is foreseeable. *Id.* at 665 (citing *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168-69 (Minn. 1989)). "To determine whether an injury was foreseeable, [courts] look to the defendant's conduct and ask whether it was objectively reasonable to expect the specific danger causing the specific injury." *Domagala v. Rolland*, 805 N.W.2d 14, 27 (Minn. 2011); *see also Grimmett v. Minn. Dep't of Corr.*, No. 12-cv-943 (JNE/LIB), 2012 WL 6060974, at *9 (D. Minn. Nov. 8, 2012) (citing *Domagala* in analyzing prison officials' tort liability for inmate's injury). "The test is not whether the precise nature and manner of the plaintiff's injury was foreseeable, but whether the possibility of an accident was clear to the person of ordinary prudence." *Domagala*, 805 N.W.2d at 27 (quotation omitted).

Plaintiffs fail to plausibly state a claim for negligence with respect to the MSOP's housing polices or any specific risk posed by A.K. because their Complaint fails to allege: (1) which individual Defendants were negligent and why; (2) any foreseeable risk of harm; or (3) any

common law duty Defendants had to protect Plaintiffs from the two incidents alleged. (ECF No. 26 at 19-21.)

### a.    Housing Policies

While the Complaint generally alleges that Defendants failed to provide safe environment (ECF No. 1 at 13-14), it does not allege how any specific Defendant was negligent. Rather, it refers exclusively to "Defendants" or the "MSOP" generally. (ECF No. 1 at 3, "Defendants Negligence"; *id.* at 6, "MSOP was negligent" and "This is a case of Negligence … by MSOP"; *id.* at 7, "Defendant's departure from the standard amounts to Negligent"; *id.* at 12, "Defendants Negligence". Lacking any clear allegations against specific Defendants, the Complaint lacks the level of specificity needed to "raise a right to relief above the speculative level," *Iqbal*, 556 U.S. at 678, and does not plausibly state a claim for negligence. *Christopherson v. Bushner*, 33 F.4th 495, 499-503 (8th Cir. 2022) (finding that negligence allegations referring to defendants as a group without alleging individual defendants' involvement failed to state a plausible claim).

The Complaint further fails to plausibly allege that the MSOP's alleged housing practices created a foreseeable risk of harm. As previously discussed, the Complaint includes no facts to support its conclusory allegation that housing civilly-committed persons with different criminal histories in the same facility creates unacceptable risk. (*See* ECF No. 1 at 13-15.) And without a foreseeable risk of harm, the Complaint also does not plausibly allege that any Defendant had a duty to protect Mr. Allan or Mr. Fernandes from harm. For these reasons, the Court recommends that Plaintiffs' negligence claim based on the MSOP's housing policies be dismissed for failure to state a claim upon which relief can be granted.

### b.    Risk Posed by A.K.

The Complaint fails to explain what Defendants Harpstead, Johnston, Kneisel or Vargeson

allegedly did or did not do to violate any duty to protect them from A.K.'s assaults. And though Plaintiffs assert particularized allegations regarding Defendants Gresczyk and Olson's alleged negligence in failing to protect them from A.K., the Complaint does not plausibly allege that either of the July altercations was reasonably foreseeable. The Complaint alleges that on July 14, 2024, A.K. "sucker punched" Mr. Allan, ostensibly without warning. (ECF No. 1 at 4.) There is no indication that A.K. posed a reasonably foreseeable threat prior to July 14. (*See generally, id.*) The Complaint also clearly states that Plaintiffs "were not worried" about A.K. before the July 16 assault based on Defendant Olson's assurance that A.K. no longer posed a threat. (*Id.* at 4.) The Complaint thus does not suggest that it was "objectively reasonable to expect the specific danger causing the specific injury" required to establish a foreseeable harm. *Domagala*, 805 N.W.2d at 27. And because the Complaint does not create an inference that either assault was foreseeable, the Complaint further fails to plausibly allege a duty of care any Defendant owed Plaintiffs. *Bjerke*, 742 N.W.2d at 664. The Court therefore recommends that Plaintiffs' negligence claim based on A.K.'s assaults be dismissed for failure to state a claim upon which relief can be granted.

### 2.    Medical Negligence

Plaintiffs also allege that Defendants' practices "unreasonably depart from the applicable standard of care recognized by the medical community". (ECF No. 1 at 7.) The Court liberally construes this allegation as a possible claim for medical negligence. To establish a claim for medical negligence under Minnesota law, Plaintiffs must show: "(1) the standard of care recognized by the medical community as applicable to the defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of the patient's injuries." *Dickhoff ex rel. Dickhoff v. Green*, 836 N.W.2d 321, 329 (Minn. 2013).

Here, the Complaint asserts no facts establishing the standard of care recognized in the medical community, or how any Defendant deviated from it.  Plaintiffs' medical negligence claim—if they intend to assert one—should be dismissed accordingly.

### 3.    Other Legal Theories

The Complaint includes a variety of other vaguely asserted allegations, but none of them is supported by actual facts, tied to any specific Defendant, or rises above a legal conclusion.

### a.    Deviation from Professional Standards

The Complaint alleges that Defendants "failed to follow established professional standards for … licensure or… professional licensing standards" (ECF No. 1 at 7), but it does not identify any law to support this contention or identify any licensing standard that any specific Defendant violated.  Moreover, Minnesota law does not establish a private cause of action for a resident asserting a licensing violation at a state facility.  *See Minn. Stat.* §§ 144.653 (providing administrative remedy for patients in licensed facilities to seek correction of licensing violations), 144.653, subd. 1 (providing that the Minnesota Department of Health is responsible for enforcing standards in applicable facilities); 245A.07 (providing that the Minnesota Department of Human Services is responsible for sanctioning noncompliance with licensing rules in applicable facilities).  This claim therefore fails to assert a viable cause of action.

### b.    Failure to Act as Mandated Reporters

The Complaint alleges that Defendants "fail to act as mandated reporters of maltreatment [and] abuse."  (ECF No. 1 at 8.)  The Complaint cites Minn. Stat. § 626.5572, which requires mandated reporting related to vulnerable adults.  *See* (ECF No. 1 at 12); *see also* Minn. Stat. § 626.5572.  Minnesota law establishes a civil action for a mandated reporter's failure to report the abuse of a vulnerable adult.  *See* Minn. Stat. § 626.557, subd. 7.  But to the extent

Plaintiffs seek to assert a claim under this statute related to A.K.'s assaults against them, the Complaint fails to establish that Plaintiffs are vulnerable adults within the meaning of the statute. *See* Minn. Stat. § 626.5572, subd. 21(a)(2) (providing that MSOP residents are not considered vulnerable adults unless they possess a physical or mental dysfunction that impairs their ability to care for themselves and protect themselves from maltreatment). The Complaint thus does not establish that any Defendant had an obligation to file a report. This claim should be dismissed accordingly.

### c.        False Representations

The Complaint alleges that Defendants "makes/made representations in recorded statements/charts that are either false; or otherwise conceals/omits or fails to disclose certain facts that render Plaintiff's current environment [sic]." (ECF No. 1 at 8.) It also alleges that "[s]uch false representations in keeping plaintiffs safe amounts to Deliberate Indifference and Negligence." *Id.* But the Complaint does not point to any specific misrepresentation or omission or identify any particular Defendant responsible for it. This barebones allegation plainly fails to establish a plausible claim. *Iqbal*, 556 U.S. at 676.

### d.        Intentional Infliction of Emotional Distress

Finally, the Complaint alleges that Defendants are liable for "intentional negligent infliction of physical and emotional distress" (ECF No. 1 at 3), and that "[b]y allowing and continuing to allow dangerous persons to continue to assault clients namely Plaintiffs and staff is an intentional infliction of emotional distress" (*id.* at 12). To the extent Plaintiffs attempt to allege a separate state law tort claim for intentional infliction of emotional distress, the Complaint fails to allege any specific action by any Defendant that was extreme and outrageous, or intentional and reckless, or that Plaintiffs' alleged emotional distress was severe. *See Larson v. Minnesota Dep't*

*of Hum. Servs.*, No. A17-1887, 2018 WL 2293532 (Minn. Ct. App. May 21, 2018) (describing elements of intentional infliction of emotional distress, citing *Stead-Bowers v. Langley*, 636 N.W.2d 334, 342 (Minn. Ct. App. 2001)).  Absent these facts, the Complaint does not allege a plausible claim for intentional infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Complaint be dismissed without prejudice on grounds of sovereign immunity and because it fails to plausibly allege any claim upon which relief may be granted.  The Court therefore need not address Defendants' challenges to the Complaint based on qualified or official immunity or the unavailability of Plaintiffs' proposed declaratory relief.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

(1)    Defendants' Motion to Dismiss Plaintiffs' Complaint (ECF No. 23) be **GRANTED**; and

(2)    This matter be **DISMISSED WITHOUT PREJUDICE**.

Dated: April 21, 2025                          *s/ Dulce J. Foster*
                                               DULCE J. FOSTER
                                               United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).